IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| KARL T. & DOROTHY J. JENNINGS FAMILY TRUST, | ) ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 120129 |
| | ) | |
| v. | ) | |
| | ) | |
| LANE COUNTY ASSESSOR , | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals the real market value of residential property identified as Account 0798973 (subject property) for the 2011-12 tax year. A trial was held on August 1, 2012, via telephone at the Oregon Tax Court, Salem, Oregon. David E. Carmichael, Attorney at Law, represented Plaintiff. Tony Wells (Wells), general manager at Prudential Pacific Properties, testified on behalf of Plaintiff. Karl Jennings (Jennings), trustee, testified on behalf of Plaintiff. Defendant's representative, Bryce Krehbiel (Krehbiel), testified on behalf of Plaintiff. Krehbiel, Residential Appraiser, Lane County Assessment and Taxation, appeared on Defendant's behalf.

Plaintiff's Exhibit 1, Plaintiff's Rebuttal Exhibit 1, and Defendant's Exhibits A through L were received without objection.

## I. STATEMENT OF FACTS

The subject property is a two-story, 1,762 square foot home located on 0.14 acres in Florence, Lane County, Oregon. (Ptf's Ex 1 at 4.) The subject property's improvement is a house built in 1979 that has a main level of 1,090 square feet and an upper level of 672 square feet. (*Id.* at 4-5.) The house has three bedrooms, two bathrooms, and an attached two-car garage. (*Id.* at 5.) The house has a heat pump heating system. (*Id.*) When the subject property

/ / /

was listed for sale in 2011, the listing stated that the "[p]roperty will be trashed out by Seller," and "[p]roperty sold 'as is' without repair." (*Id.*)

Plaintiff purchased the subject property from Deutsche Bank National Trust Company (Bank) on July 6, 2011, paying $129,699. (Ptf's Ex 1 at 1-2; Def's Ex A.) Wells testified that even though residential property in Florence, Oregon typically spends 120 to 150 days on the market before sold, the subject property was on the market for 17 days before Plaintiff purchased it. (Ptf's Ex 1 at 7.) Wells testified that the subject property was originally listed for $135,000. Jennings testified that he gave the Bank one offer of $129,699 for the subject property. Jennings testified that he had been buying properties his entire life and owned several rental properties in the Florence area. Wells testified that if Jennings thought the subject property was worth more than $129,699, he would have offered to purchase the subject property for a higher price.

Wells testified that the foreclosure market in Florence, Oregon from January to October 2011 constituted about ten percent of total listings. Wells testified that he does not believe bank owned sales are discounted, because banks are just another seller in the market. Wells testified that he believes Plaintiff's purchase of the subject property from the Bank was representative of an arms-length transaction between two informed parties.

Wells testified that the subject property could not have sold for $180,000 in January 2011. Wells testified that due to the declining real estate market in Florence, market values decreased around three percent from January 2011 to July 2011. Wells testified that two-story homes, such as the subject property, do not sell for prices as high as single-story homes, because Florence is a retirement community. Wells based his opinion on his twenty years of experience as a real estate broker.

/ / /

Wells testified that at the time of purchase, the subject property suffered from deferred maintenance. Jennings testified that the subject property had been "ruined" by the previous owner's pets. (Ptf's Ex 1 at 3.) Wells and Jennings testified that the subject property smelled like pet odor. Jennings testified that the carpet and carpet pads needed to be replaced, the interior and exterior walls repainted, and the heater replaced. Jennings testified that the door frames and doors were outdated. Jennings testified that the sewer lines needed to be unplugged and the plumbing in the kitchen and the upstairs level replaced. Jennings testified that the subject property's grounds were overgrown. Jennings testified that he had to remove a wax myrtle bush that hung over the street and a tree that hung over the subject property's roof. Jennings testified that it took nines trips with a truck and trailer to clear the brush from the subject property's grounds. Jennings testified that he put in 400 hours of labor and spent $6,000 on supplies and additional labor to restore the house. (Ptf's Rebut Ex 1 at 1-4.)

Jennings testified that the main level of the subject property includes a 240 square foot sunroom. Jennings testified that the sunroom was once a porch that a previous owner enclosed to form a room. Jennings testified that the sunroom is not supported by the subject property's foundation. Jennings testified that the sunroom is connected to the main house by an alcove that is adjacent to a bathroom. Jennings testified that odors from the bathroom escape to the sunroom. Jennings testified that a person has to travel through the sunroom to get to the backyard. Jennings testified that the sunroom has high windows and gets very hot.

Jennings testified that because 240 square feet of the subject property constitutes a sunroom that is not supported by the foundation, the subject property's square footage is

/ / /

/ / /

misrepresented as 1,762 square feet. Jennings testified that he believes the true square footage of the subject property is 1,522 square feet.[1]

The subject property's real market value on the tax roll as of the January 1, 2011, assessment date was $204,226. (Ptf's Compl at 2.) Plaintiff filed a petition to appeal the subject property's real market value to the Board of Property Tax Appeals (BOPTA), which on February 6, 2011, reduced the market value to $179,724. (*Id.*)

At trial, Plaintiff requested a 2011-12 real market value between $129,699 and $135,000. Plaintiff provided the sale price of a comparable property (Comparable # 1) as evidence of the subject property's real market value. (Ptf's Ex 1 at 8-10.) Comparable # 1 is a single-story, 1,680 square foot home that sits on 0.19 acres down the street from the subject property. (*Id.* at 8.) The home has three bedrooms, one and a half bathrooms, wall heating units, and an attached two-car garage. (*Id.* at 8-9.) Jennings testified that Comparable # 1 was "beautifully landscaped." Krehbiel testified that Plaintiff's Comparable # 1 was a bank sale and acknowledged that Plaintiff's Comparable # 1 was also Defendant's Comparable # 4.

After being on the market for 96 days, Comparable # 1 sold for $126,458. (Ptf's Ex 1 at 10.) Wells testified that Comparable # 1 was originally listed for $149,900. Wells testified that because Comparable # 1 was listed for $149,900 and sold for $126,458, Plaintiff's purchase of the subject property for $129,699 was reasonable.

At trial, Defendant requested that the court sustain the BOPTA ordered real market value of $179,724. Krehbiel testified that the subject property was bank-owned at the time Plaintiff purchased it and as a result, Plaintiff's transaction was not indicative of an "arm's-length sale." Krehbiel testified that properties purchased from banks are typically purchased at a discount

---

[1] Jennings calculated what he believes to be the subject property's square footage by subtracting 240 square feet from 1,762 square feet.

from real market value. Krehbiel provided a report from RealtyTrac showing that foreclosures in Oregon typically have sale prices averaging 26.05 percent less than real market value, and that 8.21 percent of Oregon home purchases are foreclosed properties as of the fourth quarter and year-end 2011. (Def's Ex L at 4.)

Krehbiel submitted five comparable properties based on sale date, classification, square feet, year built, and proximity to the subject property. (Def's Ex D-I.) Krehbiel testified that the comparable properties indicate that the subject property's real market value was between $168,610 and $199,000. Comparable # 1 was a 1,419 square foot, three-bedroom, two-bathroom home on a 0.24 acre lot. (Def's Ex D.) Comparable # 1 had a heat pump heating system. (*Id.*) Comparable # 1 was built in 1979 and sold for $255,000 on October 19, 2010. (*Id.*) Krehbiel testified that Comparable # 1 spent 131 days on the market before sold. Wells and Jennings testified that Comparable # 1 was located in a much more established neighborhood than the subject property. Wells testified that Comparable # 1 was landscaped, remodeled, contained wood floors, and sold for a higher price than it should have.

Comparable # 2 was a 1,540 square foot, three-bedroom, two-bathroom home on a 0.24 acre lot. (Def's Ex E.) Comparable # 2 had a forced hot air heating system. (*Id.*) Comparable # 2 was built in 1983 and sold for $160,000 on April 26, 2011. (*Id.*) Krehbiel testified that Comparable # 2 spent 6 days on the market before sold.

Comparable # 3 was a 1,596 square foot, three-bedroom, two-bathroom home on a 0.11 acre lot. (Def's Ex F.) Comparable # 3 had a radiant-ceiling heating system. (*Id.*) Comparable # 3 was built in 1972 and sold for $155,000 on November 28, 2011. (*Id.*) Krehbiel testified that Comparable # 3 spent 191 days on the market before sold. Wells testified that Comparable # 3

/ / /

was located in a commercial zone and only a block and a half away from the highway. Krehbiel acknowledged that Comparable # 3 was residential property in a commercial zone.

Comparable # 4 was a 1,680 square foot, three-bedroom, and one-and-a-half-bathroom home on a 0.19 acre lot. (Def's Ex G.) Comparable # 4 had a wall unit heating system. (*Id.*) Comparable # 4 was built in 1976 and sold for $126,458 on October 26, 2011. (*Id.*) Krehbiel testified that Comparable # 4 spent 96 days on the market before sold. Krehbiel acknowledged that Comparable # 4 was the same property as Plaintiff's Comparable # 1.

Comparable # 5 was a 1,773 square foot, three-bedroom, two-bathroom home on a 0.25 acre lot. (Def's Ex H.) Comparable # 5 had a baseboard heating system. (*Id.*) Comparable # 5 was built in 1977 and sold for $220,000 on August 18, 2010. (*Id.*) Krehbiel testified that Comparable # 5 spent 463 days on the market before sold.

Krehbiel testified that each comparable property was a "Class 4" property like the subject property. (Def's Ex I.) Krehbiel testified that all of the comparables were arm's-length transactions except for Comparable # 4, which was previously bank-owned at the time of sale like the subject property. (*Id.*)

Krehbiel adjusted the comparable properties' sale prices for time trending. (Def's Ex I.) Krehbiel calculated the time trended values of Comparables # 1, # 2, # 3, # 4, and # 5 as $225,000, $173,440, $163,556, $132,275, and $202,952 respectively. (*Id.*) Krehbiel calculated the median and average dollars per square foot of the comparable properties to both be $113 per square foot. (*Id.*) Krehbiel testified that when he calculated the median dollars per square foot of the five comparables, he did not include Comparable # 1 and Comparable # 4 in the calculation. Krehbiel testified he did not include those two comparables because Comparable # 1 was recently remodeled and Comparable # 4 was bank-owned at the time of sale.

Krehbiel testified that he did not make any adjustments to the sale prices of the comparable properties. Krehbiel also testified that he did not inspect the subject property or any of the comparable properties.

## II. ANALYSIS

At issue in this case is the subject property's real market value for the 2011-12 tax year. ORS 308.205(1)[2] defines real market value as:

> "[T]he amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2011-12 tax year was January 1, 2011. ORS 308.007(2).

A.      *Purchase price*

When determining real market value, a voluntary, arm's-length sale of a property between a willing and knowledgeable buyer and seller is "very persuasive" of real market value. *Kem v. Dept. of Rev.* (*Kem*), 267 Or 111, 114, 514 P2d 1335 (1973); *see also Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974); *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 414-15, 521 P2d 324 (1974). The two important considerations are whether or not the sale was "recent" and whether it was "arm's-length." *Kem*, 267 Or at 114-15.

Plaintiff's purchase, which was negotiated in June 2011, and closed on July 6, 2011, was not close to the January 1, 2011, assessment date. Plaintiff's purchase of the subject property was not "recent." Wells testified that market prices in Florence declined at a three percent rate between January 2011 and July 2011.

///

///

---

[2] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2009.

The next question is whether the sale was an "arm's-length" transaction. At the time of Plaintiff's purchase, the subject property was a bank-owned property. This court has addressed the issue of bank-owned property previously, observing that:

> "A property purchased through foreclosure may well involve an element of compulsion on the part of the seller. There are many practical reasons why the sale of a property following foreclosure by the lender might involve an atypical market condition rendering the transaction of little or no value as an indication of market value. For example, the lender may have a policy of selling such property only for the amount of the underlying debt, regardless of what the property may actually be worth, particularly if it would take a few months more to find a buyer willing to pay a higher price. If so, the sale, at best, likely represents the low end of the real market value range, and may have been well below the actual market value of the property."

*Kryl v. Lane County Assessor* (*Kryl*), TC-MD No 100192B, WL 1197444 at *2 (March 30, 2011).

In *Kryl*, this court gave little weight to a bank-owned property sale which occurred within a few months after the bank acquired it and after a short listing period. This court has also observed that, "a sale of bank-owned property conducted with such rapidity suggests duress or compulsion on the part of the seller, leading the court to conclude such sales as not indicative of an arm's-length transaction." *Brashnyk v. Lane County Assessor*, TC-MD No 110308, WL 6182028 at *5.

The Oregon Supreme Court, in *Ward v. Dept. of Revenue*, recognized that property purchased through foreclosure may be considered "a voluntary *bona fide* arm's-length transaction between a knowledgeable and willing buyer and a willing seller." 293 Or 506, 508, 650 P2d 923 (1982). This court has also held that "[t]here are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value." *Brashnyk*, WL 6182028 at *5. Such an exception may be recognized by the court "where the majority of sales are distress, [for] it would seem that that

kind of sale would provide a more accurate reflection of the market." *Morrow Co. Grain Growers v. Dept. of Rev.*, 10 OTR 146, 148 (1985). Bank-owned property sales may be considered as comparable sales for the purpose of establishing real market value "when those bank-owned property sales have been exposed to the open market and meet the nominal standards for an acceptable comparable sale." *Brashnyk*, WL 6182028 at *6 (internal quotation marks omitted).

Before Plaintiff purchased the subject property, the subject property was exposed to the market for 17 days. (Ptf's Ex 1 at 7.) Wells testified that in Florence the average property spent 120 to 150 days on the market before sold. The Bank accepted Plaintiff's single offer of $129,699, even though the subject property was listed for $135,000. The quick sale by the bank supports the conclusion that the sale "suggests duress or compulsion on the part of the seller, leading the court to conclude such sales as not indicative of an arm's-length transaction." *Brashnyk*, WL 6182028 at *5. Plaintiff's purchase price of $129,699 is not singularly persuasive evidence in establishing the subject property's real market value.

B.      *Comparable sales approach*

Real market value is determined by the particular methods and procedures adopted by the Department of Revenue. ORS 308.205(2). There are three methods of valuation that are used to determine real market value: 1) the cost approach, 2) the sales-comparison or comparable sales approach, and 3) the income approach. *Allen v. Dept. of Rev.,* 17 OTR 248, 252 (2003). *See also* OAR 150-308.205-(A)(2)(a) (stating that all three approaches must be considered although all three approaches may not be applicable to the valuation of the subject property). Because the subject property is a residence and not an income producing property, the income approach is inapplicable. Neither party considered the cost approach.

In a case such as this, the comparable sales approach may be used to value improved properties. Appraisal Institute, *The Appraisal of Real Estate* 300 (13th ed 2008). The legislature requires real market value to be determined in all cases by "methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2).

The Department of Revenue adopted OAR 150-308.205(A)(2)(c), stating that: "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's real market value is incorrect on the tax roll. ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Rev.*, 4 OTR 302 (1971)); ORS 305.427. Plaintiff must present the greater weight of evidence to support its requested real market value reduction. This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (internal quotation marks omitted). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D, WL 879285 (March 13, 2012). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.* (*Reed*), 310 Or 260, 265, 798 P2d 235 (1990).

"In evaluating the competing evidence, the court looks to the comparability of the different sales and the application of all necessary adjustments for differences. Adjustments are a key component in evaluating properties." *Voronaeff v. Crook County Assessor*, TC-MD No 110361C, WL 1426847 at \*3 (April 25, 2012). According to *The Appraisal of Real Estate*:

> "Ideally, if all comparable properties are identical to the subject property, no adjustments will be required. However, this is rarely the case \* \* \*. After researching and verifying transactional data and selecting the appropriate unit of comparison, the appraiser adjusts for any differences."

Appraisal Institute, *The Appraisal of Real Estate* 307 (13th ed 2008.)

In the case before the court, Plaintiff's comparable sales approach was incomplete because the selected property was not "adjusted to be comparable" to the subject property. OAR 150-308.205(A)(2)(c). Plaintiff's selected comparable property was sold 11 months after the subject property's assessment date, providing little evidence of the subject property's real market value on the assessment date. In addition to failing to adjust for date of sale, Plaintiff made no adjustment for size, quality, or other distinguishing property features.

Even though the burden has not shifted under ORS 305.427, the court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence before the court, without regard to the value pleaded by the parties." ORS 305.412. Krehbiel presented a comparable sales approach. Krehbiel only adjusted the selected comparables for time trending. Like Plaintiff, Krehbiel made no other adjustments, and his evidence in support of his determined real market value is inconclusive. However, Defendant does not have the burden of proof.

Even though Plaintiff failed to carry his burden of proof and Defendant's evidence is inconclusive, the court will look to the market in an effort to determine the real market value of the subject property. The subject property was listed for sale for 17 days. Wells testified that the

average market time for properties during 2011 was 120 to 150 days. The Bank's quick sale of the subject property "suggests duress or compulsion on the part of the seller, leading the court to conclude such sales as not indicative of an arm's-length transaction." *Brashnyk*, WL 6182028 at *5. Therefore, Plaintiff's purchase price is not singularly persuasive evidence in establishing the subject property's real market value.

Plaintiff also offered the unadjusted sale price of Comparable # 1 as evidence in support of its requested real market value as of January 1, 2011. Plaintiff's Comparable # 1, the same property as Defendant's Comparable # 4, was bank-owned at the time of sale and located 0.1 mile down the street from the subject property. (Ptf's Ex 1-8; Def's Ex G.) Jennings testified and Defendant did not dispute that Comparable # 1 was landscaped and in better condition than the subject property. Comparable # 1 was a single-story house unlike the subject property. Wells testified that because of its landscaping and single level, Comparable # 1 was a more desirable property than the subject property in the Florence market.

Comparable # 1 was originally listed for $149,900 and after spending 96 days on the market, sold for $126,458. (Def's Ex G.) The time Comparable # 1 spent on the market leads the court to conclude that the property's sale is indicative of an arm's-length transaction even though the property was bank-owned at the time of sale. Krehbiel adjusted Comparable # 1's sale price for time trending to be $132,275. (Def's Ex I.) Krehbiel made a similar adjustment to the subject property's sale price, calculating a time trended value of $133,280. (*Id.*) Because the subject property and Comparable # 1 are located on the same street in the same neighborhood and the time trended sale prices are comparable, the court concludes that those sales are an accurate reflection of the market for that neighborhood.

The subject property was listed for $135,000 in June 2011 and sold for $129,699 on July 6, 2011. Krehbiel calculated a time trended value for the subject property of $133,280 as of

January 1, 2011. The sale of Comparable # 1 supports that value. Based on the evidence presented, the court concludes that the subject property's real market value on the assessment date, January 1, 2011, was $133,280.

## III. CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that the best evidence of the subject property's real market value as of the assessment date was the time trended sale price of a neighboring property identified as Comparable # 1 and Plaintiff's time-trended purchase price. Now therefore,

IT IS THE DECISION OF THIS COURT that the 2011-12 real market value of property identified as Account 0798973 was $133,280.

Dated this _____ day of October 2012.

_____
JILL A. TANNER
PRESIDING MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Presiding Magistrate Jill A. Tanner on October 4, 2012. The Court filed and entered this Decision on October 4, 2012.*